THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LOIS L. HEARON,

                      Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                   Defendant.

CASE NO. C14-1599-JCC

ORDER

This matter comes before the Court on Plaintiff's Complaint for Judicial Review of Social Security Benefits (Dkt. No. 3), her Opening Brief (Dkt. No. 15), Defendant's Response (Dkt. No. 21), Plaintiff's Reply (Dkt. No. 22), and the Administrative Record (Dkt. No. 10). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS Plaintiff's request for relief and REMANDS for additional proceedings for the reasons explained herein.

## I.      BACKGROUND

Plaintiff Lois Hearon applied for both Title II disability benefits and Title XVI Supplemental Social Security Income ("SSI") on July 1, 2011. (Dkt. No. 10-5 at 2, 5.) In both applications, Ms. Hearon alleged a disability onset date of December 21, 2010, although this date was later amended to March 31, 2011. (*Id.*; Dkt. No. 10-2 at 52.) Ms. Hearon's applications were denied both initially and upon reconsideration. (Dkt. No. 10-3 at 22–24; Dkt. No. 10-4 at 16, 24.)

On November 5, 2012, Ms. Hearon appeared and testified before Administrative Law Judge Ilene Sloan ("ALJ"). (Dkt. No. 10-2 at 22–40.) The ALJ issued a decision on January 14, 2013, finding Ms. Hearon not disabled under the Social Security Act. (*Id.* at 40.) After her request for review of the ALJ's decision was denied, Plaintiff filed suit before this Court. (Dkt. No. 3.)

**A.       Physical and Mental Medical Symptoms**

In recent years, Ms. Hearon presented to care providers with many physical and mental difficulties. The medical diagnoses for which she has been treated around the time of her alleged onset date include: hepatitis C, diabetes, cirrhosis, depressive disorder, sleep apnea, obesity, tendonitis of her right shoulder, obsessive-compulsive disorder ("OCD"), post-traumatic stress disorder ("PTSD"), bipolar disorder, migraine headaches, hypertension, hepatic encelopathy, and substance abuse.

The Court turns first to Ms. Hearon's record of physical symptoms. In November 2008, she went to the doctor complaining of migraine headaches. (Dkt. No. 10-8 at 13.) In early 2009, she presented to medical providers with reports of difficulty sleeping, coughing, and breathing. (Dkt. No. 10-8 at 4–12.) In March 2008, Ms. Hearon was diagnosed with diabetes mellitus. (*Id.* at 16–27.) Medical records indicate that she was diagnosed with sleep apnea in September 2008. (*See, e.g.*, Dkt. No. 10-10 at 9.) In April 2010, Ms. Hearon reported to the doctor with questions regarding double-vision and difficulty seeing, which her doctor did not think was affiliated with her diabetes. (*Id.* at 31.) Her confusion, dizziness, and vision issues were later associated with hepatic encelopathy—related to liver failure—in April and May 2011. (*Id.* at 95.) July 2010 medical reports indicate that she suffered from bipolar disorder and hepatitis C, and that she had developed cirrhosis of the liver (*Id.* at 68.) In April 2011, Ms. Hearon was seen by Barbara Scott, registered nurse practitioner for, *inter alia,* vision and balance issues. (*Id.* at 76.) An examining physician in July 2011 saw Ms. Hearon after she had an episode of dizziness and double vision; Ms. Hearon was assessed as having "end stage liver disease," but also that "from a liver standpoint, she seems to be holding stable." (*Id.* at 92–93.) With medical treatment, Ms. Hearon

noticed an improvement in her encelopathy symptoms. (*See* Dkt. No. 10-10 at 45–47.) Ms. Hearon's medical and counseling records include many reports of overeating and weight gain; for example, her eligibility for a liver transplant was dependent on her losing weight. (Dkt. No. 10-8 at 96.) In November 2011, Ms Hearon was diagnosed with tendonitis in her right shoulder. (Dkt. No. 10-11 at 63.)

Medical records further detail Ms. Hearon's mental health difficulties. An April 2011 visit with mental health providers lists her diagnoses as including bipolar II disorder, PTSD, and polysubstance dependence.[1] (Dkt. No. 10-9 at 3.) Mental health providers identified management of major depressive episodes and high levels of social anxiety as priorities for Ms. Hearon's treatment. (*Id.* at 4; Dkt. No. 10-12 at 23.)

**B.     Work History**

Ms. Hearon previously worked at Wal-Mart, though indicates that she was fired based on attendance issues related to depression. (*See* Dkt. No. 10-2 at 31–32.) Her other work history includes employment as a program assistant at Western Washington University and as a switchboard operator at Compass Health. (Dkt. No. 10-9 at 3.) In February 2011, Ms. Hearon reported that she wasn't sure if she wanted to return to work. (Dkt. No. 10-8 at 82.) In March 2011, she told Laura A. Larson, PA-C that she lost her job at Wal-Mart and had been feeling depressed for that reason. (*Id.* at 98.) In meetings with mental health providers, Ms. Hearon described herself as having "been fired from every job I've ever had, from my temper, to calling in sick too many times." Treatment notes from counseling report that in January 2012, Ms. Hearon ran into her former supervisor at Wal-Mart who asked her "when she might be coming back to work." (Dkt. No. 10-12 at 61.)

**C.     Drug Use**

Ms. Hearon's medical records demonstrate a history of using drugs, including

---

[1] Visit records indicate that her substance abuse was "in sustained remission," per Ms. Hearon.

methamphetamine. In July 2011, a doctor's report lists that she had visible "lumps where she has been injecting" and that she "says she is using clean needles." (Dkt. No. 10-10 at 77.) That same doctor's visit included a note from Dr. Shilpa Jog, M.D., detailing Ms. Hearon's drug abuse: "IV drug abuse – discussed in detail about this . . . I told her I feel very disappointed. I have known her for over 3 years and she has done so well in these years in terms of taking care of herself." (*Id.* at 79.) Treatment notes with her counselor indicate meth use in August 2011 and attempted, but unsuccessful, meth use in July 2012.[2] (Dkt. No. 10-12 at 58, 67.)

## II.   DISCUSSION

### A.   Scope of District Court Review

### 1.   The Substantial Evidence and Harmless Error Standards

A district court may disturb the Commissioner's decision to deny Social Security benefits "only if it is not supported by substantial evidence or based on legal error." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). This Court's review of the Commissioner's decision is therefore limited to an inquiry as to (1) whether there is substantial evidence to support the findings of the Commissioner and (2) whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir.1995).

Substantial evidence is "more than a mere scintilla, but may be less than a preponderance." *Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001). Substantial evidence means "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." *Id.* When the evidence before an ALJ is subject to multiple

---

[2] Ms. Hearon was treated at the Everett Clinic on July 16, 2012, for a painful abscess from needle use. (Dkt. No. 10-12 at 45.) The treatment notes do not elaborate on whether there was, as Ms. Hearon said in counseling, enough meth to actually inject. (*Id.*) The doctor's notes include that, "[Ms. Hearon] [r]esumed using IV drugs after more than a decade of sobriety." (*Id.*)

rational interpretations, the Court must grant deference to the ALJ's decision. *Batson v. Comm'r of Social Security Administration*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Ninth Circuit courts are to review Social Security Act cases under a harmless error framework. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Security Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (collecting cases)). The harmless error inquiry requires that "in each case we look at the record as a whole to determine [if] the error alters the outcome of the case." *Id.* "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'" *Id.* (quoting *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008)) (other citations omitted). In other words—regardless of whether an ALJ errs by misapplying a legal standard or failing to support her decision with substantial factual evidence—if the error is harmless, it does not constitute grounds for reversal. As such, district courts must review cases "without regard to errors that do not affect the parties' substantial rights." *Id.* at 1118 (internal quotations omitted).

## 2.  The ALJ's Five-Step Sequential Evaluation

In determining disability, the ALJ considers a five-step sequential evaluation process. The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful upon consideration of the first four steps, the burden then shifts to the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920. The five steps are as follows:

(1) First, the claimant must prove that she is not currently engaged in substantial gainful activity;

(2) Second, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities;"

(3) Third, the ALJ must determine that the claimant is disabled because she proves that her impairments meet or are medically equivalent to one of those listed at 20 CFR part 404, Subpart P, App'x 1. If the claimant's impairment neither meets nor equals one of the listings, the case cannot be resolved at step

three and the evaluation proceeds;

(4) Fourth, the claimant bears the burden of proving that she is incapable of meeting the physical and mental demands of her past relevant work; and, if she does,

(5) Fifth, the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education, and past work experience, that she is capable of performing other work. If the Commissioner proves that other work exists which the claimant can perform, the claimant is given the opportunity to rebut this evidence.

*Tackett*, 180 F.3d at 1098–99.

Here, the ALJ found that Ms. Hearon had not engaged in substantial gainful activity since her alleged onset date, satisfying step one. (Dkt. No. 10-2 at 27.) At step two, the ALJ found that Ms. Hearon's hepatitis C, cirrhosis, depressive disorder, diabetes, sleep apnea, and obesity were severe impairments. (*Id.*) Accordingly, the ALJ proceeded to step three, where she found that Ms. Hearon's impairments did not meet or medically equal a "listing" under 20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925, and 416.926. (*Id.* at 28.) The analysis then proceeded to step four, and upon consideration of the record including the medical testimony, Ms. Hearon's testimony, and the testimony of Ms. Hearon's health care providers and mother, the ALJ found that Ms. Hearon possessed the residual functional capacity to perform light work and that she was capable of performing past relevant work as a mail clerk. (*Id.* at 30–38.) The ALJ continued to enter "alternative findings" under step five, finding that Ms. Hearon could find work in the national economy as a cashier, hotel/motel housekeeper, and folder. (*Id.* at 39.) As such, she was not considered disabled and her application for benefits was denied. (*Id.* at 40.)

Ms. Hearon submits that the ALJ committed reversible error by (1) failing to properly consider the opinions of treating and examining physicians, (2) failing to find Ms. Hearon's OCD, bipolar disorder, PTSD, migraines, encephalopathy, and tendonitis to be "severe" impairments, and (3) not supporting her residual functional capacity determinations with substantial evidence. (Dkt. No. 15 at 1–2.)

The Court agrees that it was reversible error for the ALJ to discount the medical opinion

1  of Ms. Hearon's treating psychiatrist, Dr. Supriya Kang, M.D., in the manner she did. Finding

2  reversible error on this ground, the Court does not reach the remainder of the claims raised by

3  Ms. Hearon in her Complaint.

4  **B.      The ALJ's Decision Contained Reversible Error**

5  **1.      Weight Assigned to Physician Testimony**

6       Ms. Hearon argues that the ALJ improperly discounted the testimony of her treating

7  psychiatrist, Dr. Kang; the DSHS examining physician, Dr. Roger Meinz, Ph.D.; and a DSHS

8  reviewing physician, Dr. Phyllis N. Sanchez, Ph.D. (Dkt. No. 15 at 3–7.)

9       The ALJ is responsible for determining credibility and resolving ambiguities and

10  conflicts in the medical evidence. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

11  Where the medical evidence in the record is not conclusive, "questions of credibility and

12  resolution of conflicts" are solely the functions of the ALJ. *Sample v. Schweiker*, 694 F.2d 639,

13  642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." *Morgan v. Comm'r*

14  *of the Soc. Security Admin.*, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether

15  inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and

16  whether certain factors are relevant to discount" the opinions of medical experts "falls within this

17  responsibility." *Id.* at 603.

18  **a.      "Specific, Legitimate Reasons" Versus "Clear and Convincing Evidence" Standards**

19       In resolving questions of credibility and conflicts in the evidence, an ALJ's findings

20  "must be supported by specific, cogent reasons." *Reddick*, 157 F.3d at 725. The ALJ can do this

21  "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

22  stating his interpretation thereof, and making findings." *Id.* The ALJ also may draw inferences

23  "logically flowing from the evidence." *Sample*, 694 F.2d at 642. Further, the Court itself may

24  draw "specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*, 881

25  F.2d 747, 755, (9th Cir. 1989).

26

ORDER
PAGE - 7

1        The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted

2   opinion of either a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

3   1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can

4   only be rejected for specific and legitimate reasons that are supported by substantial evidence in

5   the record." *Id.* at 830–31. However, the ALJ "need not discuss all evidence presented" to him or

6   her. *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (citation

7   omitted). The ALJ must only explain why "significant probative evidence has been rejected." *Id.*;

8   *see also Cotter v. Harris*, 642 F.2d 700, 706–07 (3rd Cir. 1981); *Garfield v. Schweiker*, 732 F.2d

9   605, 610 (7th Cir. 1984).

10   **b.     The Weight Given to Various Medical Testimony**

11        In general, more weight is given to a treating physician's opinion than to the opinions of

12   those who do not treat the claimant. *See Lester*, 81 F.3d at 830. On the other hand, an ALJ need

13   not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and

14   inadequately supported by clinical findings" or "by the record as a whole." *Batson v. Comm'r of*

15   *Soc. Security Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *see also Thomas v. Barnhart*, 278

16   F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). An

17   examining physician's opinion is "entitled to greater weight than the opinion of a non-examining

18   physician." *Lester*, 81 F.3d at 830–31. A non-examining physician's opinion may constitute

19   substantial evidence if "it is consistent with other independent evidence in the record." *Id.* at

20   830–31; *Tonapetyan*, 242 F.3d at 1149. However, where a non-treating, examining physician

21   relies on the same clinical findings as the treating physician and differs in conclusion alone, the

22   examining physician's conclusions do not constitute "substantial evidence." *Orn v. Astrue*, 495

23   F.3d 625, 632 (9th Cir. 2007). Not until there is "substantial evidence in the record contradicting

24   the opinion of the treating physician," does the treating physician's opinion cease to be "entitled

25   to controlling weight." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)) (internal quotation marks

26   omitted).

1    **c.      Treatment of Medical Testimony in Ms. Hearon's Case**

2    **1.      Dr. Kang**

3           The ALJ assigned little weight to the testimony of Ms. Hearon's treating psychiatrist, Dr.

4    Supriya Kang, M.D.. (Dkt. No. 10-2 at 35.) In so doing, the ALJ offered two reasons: (1) first,

5    that Dr. Kang noted in October 2012 that Ms. Hearon "does not abuse drugs or alcohol" (Dkt.

6    No. 10-12 at 24), and (2) second, that Dr. Kang's assessment of her social anxiety is contradicted

7    by evidence of Ms. Hearon's social activities. (Dkt. No. 10-2 at 35.)

8           Dr. Kang's opinion is contradicted by stage agency doctors Eugene Kester, M.D. and

9    Matthew Comrie, Psy.D. (Dkt. No. 10-2 at 36.) As such, the ALJ need only have provided

10   "specific and legitimate reasons" supported by substantial evidence for her discounting of Dr.

11   Kang's testimony. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). However, this Court

12   finds that the ALJ did not provide legally sufficient reasons for discounting Dr. Kang's

13   testimony.

14          First, the ALJ found Dr. Kang's October 6, 2012 assessment that Ms. Hearon was not

15   abusing drugs or alcohol (Dkt. No. 10-12 at 24) contradicted by "[Ms. Hearon's] extensive use

16   since initiating care with the doctor." (Dkt. No. 10-2 at 35.) This Court finds the ALJ's

17   assessment problematic for two reasons. First, in construing Dr. Kang's testimony as inconsistent

18   with the overall record, the ALJ identified no objective medical evidence contradicting Dr.

19   Kang's evaluation and treatment notes. (*Id.*) In fact, there is no evidence of "extensive use since

20   initiating care" with Dr. Kang—the record before the Court establishes no drug use around or

21   after October 2012. Second, no objective evidence indicates that meth use or attempted meth use

22   in July 2012—four months prior to Dr. Kang's treatment and evaluation—actually de-valued Dr.

23   Kang's medical opinion. (*See* Dkt. No. 10-12 at 58, 67.) There is not substantial evidence to

24   question the validity of Dr. Kang's medical opinion on the basis of Ms. Hearon's prior drug use.

25          Second, the ALJ found Dr. Kang's assessment of Ms. Hearon's social anxiety to be

26   inconsistent with evidence in the record that Ms. Hearon engaged in limited social activities. Dr.

1    Kang reported in October 2012 that Ms. Hearon "continues to struggle with severe mood

2    fluctuations, fatigue, irritability, and anxiety which cause marked functional impairment" and

3    that "she has social anxiety which severely limits her interactions with others." (Dkt. No. 10-12

4    at 23.) The ALJ discounted this medical testimony because Ms. Hearon also attended recovery

5    groups and meetings, spent some time with family and friends, engaged in prostitution, and sold

6    small goods for an incarcerated friend. (Dkt. No. 10-2 at 35.)

7            The Court is troubled by the ALJ's assumption that Ms. Hearon's participation in

8    occasional social activities[3] somehow negated the social anxiety or difficulty she was

9    experiencing throughout her involvement in such activities. The ALJ inferred that Ms. Hearon's

10   activities—many of them likely done in pursuit of treatment or out of possible financial duress—

11   demonstrated a lack of social anxiety.

12           The ALJ's inference was not only unfounded and unsupported, but in making it, the ALJ

13   impermissibly substituted her lay opinion for that of a medical expert. It is well established that

14   an ALJ may not substitute her opinion for that of a competent medical expert. *See Day v.*

15   *Weinburg*, 522 F.2d 1154, 1156 (9th Cir. 1975); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.

16   1999); *Balsamo v. Chater*, 142 F.3d 75, 81 (2nd Cir. 1998); *Rohan v. Chater*, 98 F.3d 966, 970

17   (7th Cir. 1996).

18           Moreover, this case is distinguishable from *Morgan v. Comm'r of Soc. Sec. Admin.*, 160

19   F.3d 595 (9th Cir. 1999). In *Morgan*, the Ninth Circuit upheld the ALJ's determination that the

20   claimant's ability to do daily tasks served as "evidence of [his] ability to work." 160 F.3d at 600.

21   In so ruling, the Court noted, "If a claimant is able to spend a substantial part of his day engaged

22   in pursuits involving the performance of physical functions that are transferable to a work

23   setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations."

24   _____

25   [3] The Court is especially loathe to endorse the ALJ's classification of prostitution as a "social activity," given the
     coercive nature and history of selling sex for money. *See* Janet Halley, Prabha Kotiswaran, Hila Shamir, Chantal

26   Thomas, *From the International to the Local in Feminist Legal Responses to Rape, Prostitution/sex Work, and Sex
     Trafficking: Four Studies in Contemporary Governance Feminism*, 29 Harv. J. L. & Gender 335, 349 (2006).

1   *Id.* (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). This Court finds *Morgan*

2   distinguishable from Ms. Hearon's case for three chief reasons. First, the *Morgan* decision

3   pertained to a Social Security claimant's engaging in "physical functions" for a "substantial" part

4   of his or her day, which does not accurately describe the activities performed by Ms. Hearon.[4]

5   Second, the treating psychiatrist opinion at issue in *Morgan* offered less robust evidence of

6   possible disability than the opinion offered here by Dr. Kang; for example, in *Morgan*, the

7   psychiatrist noted that the claimant's symptoms improved with medication. *Id.* at 600. Third, and

8   most importantly, the physical functions chronicled by the Court in *Morgan* were used to

9   discredit the testimony of the claimant, rather than the treating physician. *Id.* Where, as here, a

10  treating psychiatrist's medical opinion was discounted based on the ALJ's inference regarding

11  the presence of some social activities, *Morgan* does not preclude reversal.

12          The ALJ's assignment of little weight to Dr. Kang's testimony was not accompanied by

13  specific, legitimate reasons supported by the necessary substantial evidence. In other words, in

14  treating Dr. Kang's testimony in the manner she did, the ALJ committed error. Nor was the error

15  harmless: assigning little weight to Dr. Kang's opinion and supplanting it with her own factored

16  heavily into the ALJ's residual functional capacity ("RFC") determination. Had the ALJ not

17  discredited Dr. Kang's opinion, the RFC would have included additional limitations, as would

18  the hypothetical questions posed to the vocational expert. As the ALJ's ultimate determination

19  regarding disability was based on her finding that Ms. Hearon was capable of performing past

20  relevant work based on that RFC, as well as the testimony of the vocational expert on the basis

21  of improper hypothetical questions, these errors affected the ultimate disability determination

22  and are not harmless.

23          More specifically, the ALJ's finding that Ms. Hearon possessed the residual functional

24  capacity for light work and could understand, remember, and carry out unskilled work as well as

25  _____

26  [4] Rather, Ms. Hearon's testimony, corroborated by her mother's, is that she spends most days alone, watching
    television, and sitting with her cats. (Dkt. No. 10-2 at 62–64; Dkt. No. 10-6 at 44.)

"deal with occasional changes in the workplace setting," and her alternative finding that Ms. Hearon could work as a cashier (a job that requires social interaction) required a rejection of Dr. Kang's opinion that Ms. Hearon would be largely inhibited in her social interactions. This, in turn, led to the ALJ's finding that Ms. Hearon was not disabled. The ALJ's discounting of Dr. Kang's medical opinion is therefore reversible error.

## C.   Remand for Additional Evidence

The Court may remand this case "either for additional evidence and findings or to award benefits." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," such that "remand for an immediate award of benefits is appropriate." *Id.*

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." *Smolen*, 80 F.3d 1273 at 1292; *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence,
>
> (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and
>
> (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen*, 80 F.3d 1273 at 1292; *McCartey v. Massanari*, 298 F.3d 1072, 1076–77 (9th Cir. 2002). Here, issues still remain regarding the use of medical opinions to evaluate Ms. Hearon's functional capabilities and her ability to perform past relevant work or other work available in

the national economy. Accordingly, remand for further consideration is warranted in this matter.

**III.      CONCLUSION**

Based on the foregoing discussion, the Court hereby finds that the ALJ improperly concluded that Ms. Hearon was not disabled. Accordingly, the Commissioner's decision to deny benefits is REVERSED and this matter is REMANDED for further administrative proceedings in accordance with the findings contained herein.

DATED this 26 day of August 2015.

John C. Coughenour
UNITED STATES DISTRICT JUDGE